The next case is Lake Eugenie v. BP Exploration. Mr. Olson seems to be first up. Thank you, Your Honor. May it please the Court. Theodore Olson on behalf of BP. The court-appointed claims administrator of the court-supervised Deepwater Horizon settlement program must be removed because of a conflict of interest. The case for removal is compelling and we submit essentially undisputed. At the time of his appointment, he gave assurances that there were no issues and no grounds for disqualification which would prevent him from being fair and impartial. In fact, he served, without having disclosed it, as counsel to Louisiana with respect to filing briefs in this proceeding, MDL 2179, against BP. As counsel for Louisiana, he also was in communication with the Gulf Coast Claims Facility advocating policies with respect to documentation and compensation of claimants, which were adverse to BP and were the same policies or the same types of policies and procedures and protocols that he subsequently ruled on as claims administrator. Counsel, we have Judge Barbier's fact-finding that BP was on notice of the essentials of what you're now talking about. You were on notice in his finding of the fact that he was a consultant, Mr. Juneau was a consultant with the state of Louisiana. In light of that and the other interactions between Juneau and some of BP's officials prior to the selection of Juneau as a claims administrator, how do we get a handle that benefits you on this fact-finding by Judge Barbier that at most, and I don't even know if the judge put it this way, at most you're talking about a few extra items that are consistent with what you did know. They're not consistent, Your Honor. We submit what Judge Barbier found was that BP knew that Mr. Juneau had been a consultant. Mr. Juneau says today, and he said then, and he says throughout this litigation, and I'm talking about what he has asserted to the district court and to this court, that he was a consultant with respect to methodologies and allocation of claims, and that he helped Louisiana understand the Gulf Coast Claims Facility. He did not disclose and Judge Barbier did not rule on the essential points of basis for disqualification here, acting in a litigation capacity, helping to draft briefs. Well, I'm not sure you have this bright-line distinction between consulting and advocacy or litigation. When someone is involved in legal matters and hires a consultant, isn't it expected that the consultant reviews their filings and is giving them advice on how to maximize their legal position? Explain to me this distinction you're drawing. I agree that this is not a bright-line distinction. What Mr. Juneau is saying, with all due respect to him, is that he acted in an advisory capacity to tell Louisiana how this Gulf Coast Claims Facility worked. He specifically says in his declaration and in his briefs to the district court that he did not act in a litigation capacity. You would know, and we would know, and anybody involved in litigation would want to know, if the person that was being appointed to be a so-called neutral, unbiased administrator performing a judicial function had actually assisted in writing briefs against you or your client. That would be an important distinction, and he continues to say— I should have examined that back when he was being considered for appointment, and when BP knew he'd been a consultant for this state. Explain to me what exactly happened last summer. I think you say it's July of 2014, and I think your brief says that your general counsel became aware of the contract. How did that come about? And then just started finding stuff that was already in BP's position. So what exactly happened last summer? The information came to BP last summer from outside sources, from other sources, that said that Mr. Juneau had actually had a contract with the state of Louisiana that his role was much considerably greater. That triggered— How did that contract come to light? I guess that's what I'm trying to figure out. It came to light from outside persons that had been investigating and looking into this. It wasn't something that— Shouldn't that investigation have occurred before your party agreed to Juneau? In other words, I thought that Juneau admitted and that your people knew that he consulted with Louisiana. As a matter of fact, I thought there was something that they had actually taken a position against the old regime, the way it was handled. I mean, are you saying all you knew and all you should have known was that he was a consultant from Louisiana and that you needn't look any further in going ahead and approving him for this position? I believe the cases are consistent, Your Honor, that it's not the litigant's responsibility to conduct an investigation of a judicial officer. It is the judicial officer's responsibility to make— Is he a judicial officer? Well, we submit that he is a judicial officer, what he is doing, and he is a court-appointed official monitoring and supervising a court procedure under Rule 23. He evaluates evidence. He determines policies. He articulates those policies. He applies those policies to a claims procedure. He makes awards. He's performing a judicial function. He has said in this court and in the district court that he was performing judicial functions. So what he was doing is—prior to this, it's his responsibility to make a full disclosure. The claims—the procedure that he has established, the code of conduct for the court-supervised settlement program specifically talks about a court—he's a court-appointed official. He is supposed to conduct himself in accordance with the applicable code of professional conduct, and he admonishes in this code of conduct for the facility that his employees, his subordinates, must make full disclosures, put it all out there, and full access to information. Now, the difference is that BP was not aware that he was acting as a litigant, as an advocate. He is still saying to this day—he refers to the briefs that were filed in this proceeding. And by the way, Section 455B is not waivable, so there can't be a waiver here. He acted as a lawyer in this controversy. That is a not waivable conflict. I'm sorry, Mr. Olson. He said that he was involved in the methodology of the claims matters. One of the two briefs that you're talking about that showed he was participating as an advocate in the MDL was a notice of joinder by the state of Louisiana and a motion to supervise ex parte communications between the parties. And the motion was actually filed, I guess, by the class representative or by somebody. Well, it wouldn't have been back in that time. And it seems to me that's not a bad characterization of what that brief dealt with. Now, he didn't say in the methodology of the claims administration. And he was talking about how you supervise the communications between class members and the defendants. And I don't know what the other brief is. You know it well. I don't have that in front of me. But part of what's facing us, as you fully appreciate, is that you knew something. Your client knew something back at the appropriate time. And it does seem to me that brief that I just talked about is one example of what Juneau said may not have been as clear as it could have been, but it wasn't a misstatement, it seems to me, at least of what this brief was doing. And so I think what you are telling us, that there is a bright line here, that because he represented a party, Louisiana, joining in a previous filing by somebody else in an MDL that we now have as part of what we're looking at, that he's automatically disqualified, despite that perhaps you should have been pursuing this better back when you first heard that he was a consultant. And there's a lot of steps here that are not well supported by case law. Well, I believe we submit that the positions we're taking are well supported by case law in the first place, respectfully. With respect to Section 455, it is a bright line where in private practice he served as a lawyer in a matter in controversy. Now he's now taking the position that he was not a lawyer, but he was helping to draft a brief. He said it's a different matter, but it's the oil spill and claims with respect to the oil spill, and it's MDL 2179, so it is the same matter. He says that he wasn't adverse. The brief itself, and there were two briefs, specifically took positions that BP wasn't paying enough. It wasn't paying enough rapidly enough. It was requiring too much documentation. It took the position that the claims facility should be monitored with respect to communication with the claimants. That was an adverse position. So he was a lawyer, and he says it wasn't litigation. All of those things are not correct. He was a lawyer. It was the same matter. He was adverse. It is the matter in controversy with respect to 455B. Therefore, there is a bright line. Now with respect to 455A, would a reasonable, objective person believe that his impartiality might reasonably be questioned? If he had been a consultant in saying this is how – and he's an expert. He says that he knows how these claims facilities work. I'm going to tell you how it works. That's one thing that he implied by saying the word consultant, and what he said in his declarations and his briefs is what he was doing. What he failed to disclose, which I believe any objective person facing this situation would say this causes questions with respect to whether your impartiality can reasonably be questioned. The tests are the possibility because of the importance of individuals not taking a position as a part of the judiciary. Before we get to these issues, we have to have jurisdiction, of course, and that's a big issue in this case we haven't talked about yet. You argue, I guess, three different approaches. One, alternatively say it's a mandamus. Two, you say effectively the district court denied an injunction, and then you also have collateral order. Which of those three is your best case for jurisdiction? The strongest case is the collateral order doctrine. This is an issue that's separate from the merits. It's a matter of law that will be dispositive of the issue, and it's very, very important, and it's not remediable on appeal. What seems tough about that is the collateral order doctrine applies when you've got an order during the pendency of a case, and ultimately there's going to be a final judgment that can be appealed, and the question is whether this intermediate decision should be able to be subject to appeal. But here, there is no final appeal. I mean, maybe that strengthens your case because there's no other avenue for challenging this, but the settlement agreement is done, right? There's no final order, so why is any of this even appealed? Well, I believe that, Your Honor, this court addressed that specifically in the context of a previous appeal. In this case, Deepwater Horizon 1, footnote 3, we have jurisdiction. Defining the court to include this court. This court, yes. This court, footnote 3 in Deepwater Horizon 1, we have jurisdiction of that appeal. The order conclusively determines the dispute. This conclusively determines whether or not Judge Juneau or Claims Administrator Juneau, and by the way, he calls himself, his law firm refers to him as a special master. But the court went on to say in that footnote, the issue is completely separate from the merits, unreviewable, unappeal from final judgment because at that point, the money will have been paid out and BP cannot recover it. I think we have a case pending where this court will decide the question of whether a final decision with respect to a particular claimant, whether there can be an appeal from the determination made by Judge Barbier as to a particular claim, or whether or not the agreement that was reached doesn't provide for appellate review. I think the issue in that case is whether there has to be a waiver, written waiver or acknowledged waiver of a right to appeal. So depending on how that case comes out, it might be coming out fairly soon. I don't know. But depending on how this court came out on that issue, that would have some bearing on the collateral order doctrine because if this court determines that there is review, then that issue would be reviewable in each of these final determinations as to the claim. I understand that point, Your Honor, but it seems to me that is at least addressed in substance in this footnote. What BP would have to do is to make that objection in every one of those individual cases. It would then have to go to Judge Barbier. Then it would have to come up here and so forth. So you'd have—this would be an impossible— But it would be decided one time. But it would be, if that case comes out—I mean, it puts us in a situation, kind of an awkward situation, is if we decide this case first and say the collateral order doctrine applies because it's not available on appeal. But then in the other case, we come up and say, well, each individual claim, there is a right to appeal. Then we have inconsistency. But it also seems to me it's distinguishable because of what you said in footnote three, because the money is being paid out. It's unrecoverable. The appeals in those cases will have to do with legal issues with respect to policy. They would have to raise this whole issue of recusal and removal every single time. What we submit is that this is a situation, and the test is not whether Mr. Juneau did something underhanded or deceitful. But the fact is that there was not full disclosure, as his own code of conduct calls, that would make a reasonable person say, wait a minute, I'm not sure that you can be impartial here. That is the standard under 455A. The standard is, with respect to 455B, whether he has been a lawyer in the controversy. Both of those standards are met here, we submit, and it calls for removal. If you were to succeed and get Juneau removed, you want an injunction on certain interpretations that he's been involved in. But my understanding is he's one of only three people, and if there's a disagreement among those three, the district judge has a final interpretation. So what's your basis for enjoining those interpretations, even if you're right about Juneau? Well, the fact that there's . . . may I? The fact that there is a de novo review or any kind of review by a three-judge process under all of the cases, and we've cited them, that does not insulate the magistrate or the quasi-judicial officer in this situation from the standards applicable to the judiciary, because it's a standard that protects the integrity of the judiciary itself. And the courts, a couple of times, have mentioned that we've cited those cases in the brief. Even de novo review would not insulate the judicial officer from the issue. But that's assuming he's a judicial officer, not under all these other bases you have. Well, we submit that every case that you've decided, and other courts have decided, that he is performing a judicial function. He even makes that argument and has made that argument in this court. Thank you, Counsel. We'll hear from you again, I believe. May it please the Court, Samuel Izakroff for the class. I'll begin with the factual question that came up first, and then I'll come back to the jurisdictional issue, if that's all right with the Court. There are three findings by the district court that are absolutely dispositive of this appeal. And it's important to recall that we are not here as a trial court. We are not here as a court of first instance reviewing Mr. Juneau's conduct. This is a court of appeals that looks necessarily to the record below and to the decision of the district court and affords the deference for the factual findings that it made. The three findings are, first and foremost, that BP was on inquiry notice. In fact, the court found that they were on actual notice of what was the background of Mr. Juneau. These supposed discoveries that took place beginning last summer were matters of public record. They were articles in the New York Times that described what Mr. Juneau's role was as a consultant to the State of Louisiana. In the record, we have Mr. Juneau flying around the State of Louisiana doing inspections together with BP officials. We have a statement from Mr. Feinberg that he forwarded to one of the lawyers at Arnold and Porter for BP. All of the correspondence between himself and Mr. Juneau. All of these things the district court assessed and made a finding that BP was, in fact, on notice. Now, it is striking that this goes back to facts that were available in 2012 when Mr. Juneau was appointed. Had this been presented to the district court in the proper fashion as a 60B2 motion saying we have newly discovered evidence, we want relief from the judgment, they are limited to one year, and they are limited to a standard of reasonable diligence in trying to uncover what the facts were. There is no evidence of diligence here at all. What happened in the summer of 2014 that all of a sudden these records were unearthed? What happened was somebody filed an open records act with the State of Louisiana asking for Mr. Juneau's billing records. They could have done that. They could have done that at any point. They could have asked for this in 2012. They could have asked for it the first time they met with Mr. Juneau. Counsel, you're obviously talking about the fact finding, but it does seem to me that to the extent you are correct, the principle that we would be adopting is before someone in this capacity or a capacity like this would be selected and approved, that sort of background check is necessary, despite that the individual who is being considered for claims administrator has disclosed what he had done. So you're saying that a litigant must go behind that with four-year requests, basically challenging before selecting, and this was moving fairly quickly back in February or so of 2012, whenever it was. Is that the standard that has been recognized by courts, that that sort of intrusive discovery is necessary despite the representations by the party who is being considered, the individual who is being considered? First of all, we don't know what the disclosures were because the only document in the record is a statement by Mr. Holstein, who says on his personal knowledge he didn't know about this, but he wasn't at the first interview with Mr. Juneau. We have the contemporaneous notes of Mr. Moskowitz, who said that Juneau told him about his role for the State of Louisiana. There's nothing further in those notes. Conspicuously, there's no statement from Mr. Moskowitz at the district court level or in the record before this court saying what, in fact, Mr. Juneau told at the time, and the evidence in the record suggests that they knew exactly what they wanted to know. It wasn't that they were deceived. They knew more than they let on, and if I can quote, for example, from the New York Times article, which is referenced in Mr. Holstein's declaration, it says Mr. Juneau was working as a liaison to Mr. Feinberg on behalf of the Attorney General of Louisiana, but then it quotes Mr. Juneau saying the following. Obviously, we're at ground zero here in Louisiana, and the farther away someone is from the oil, the more questions are raised by the claim, like whether the losses were really the result of the spill. In another statement, he says that a claimant must prove without question that there is a causal connection with the accident. That will sound familiar to this court because that was the issue at BEL. That was the issue that was litigated all the way to the Supreme Court. BP knew exactly what they wanted. They wanted somebody who had a restrictive view of causation. They had done their due diligence. There's nothing in the record that shows any statements by Mr. Juneau inconsistent with the interests of BP in this litigation. So they come forward, and the answer to your question, Judge Southwick, is that even if this were a criminal case, even if somebody were facing incarceration and they said we have newly discovered evidence, it's not just that there might have been evidence. There's an obligation of diligence in unearthing it. Now, I mentioned at the beginning that there were three factors. Since you may be moving slightly on, let me see if you can add a little bit to what you just said. The basic argument by BP is they had one representation by Mr. Juneau of his capacity, which was fairly limited, and consulting basis was all of what that may or may not mean. And then they learned of actual participation in an MDL, these two briefs that were filed, one of them which we discussed in some detail. It seems to me that is quite relevant if, in fact, 455 applies to this. If 455 does not apply to this, then some sense of actual participation in the litigation as an automatic disqualifier is probably not where we would be coming out. So I don't know where this fits in between your division of responsibility, but can you address, are you the right person to be addressing the right standards to be applicable here? Mr. Juneau's lawyer will address it. We've got a lot to cover. I'm not trying to duplicate things. But I'd like to address one facet of it because the district court made a critical fact finding on this issue. The fact finding by the district court was that Mr. Juneau is not a special master. He is not a judicial officer. How do we know this? Well, we know that Rule 53 is absolutely categorical, that before there is the appointment of a special master, there must be, and it doesn't say may or should be or can be waivable, there must be the filing of a 455 declaration. We know that Mr. Juneau never filed a 455 declaration. We know that BP never sought to have him file a 455 declaration, nor candidly did we, because nobody at the time believed that he was a judicial officer. He is a claims administrator. It is an important role, but it is a functionary of the settlement process itself. He is a creature of the settlement. Now, is it supervised by the court? Of course. But there are multiple layers. There is a three-member appellate panel that stands between, and there is effectively de novo review by the district court. No one has presented Mr. Juneau as a judicial officer at any point, and, in fact, the parties were quite clear in not having him go through the Rule 53 process. So when Judge Barbier says that he is not a judicial officer, he is not an officer of my court, that is a factual finding, which is a fact. How could he be a judicial officer? It was a private settlement entered by parties. They could have written the rules. They could have written the settlement and could have put his obligations that they didn't have to be like this. The court didn't determine what Mr. Juneau's obligations were going to be. I thought they were agreed upon, including what his obligations were and who his primary obligations were and to maximize the benefits to the claimants as provided. How do private people who are free to negotiate, negotiate for a position, determine what that person's job is outside of a legal framework where a judge doesn't dictate it, and then all of a sudden he becomes a judicial officer? I fully agree with you, Judge Benavidez. The parties could have appointed Mr. Olson as the claims administrator. Now, Mr. Olson will get back and say, yes, but then I had a duty to disclose. He has a duty to disclose only what we ask him. He has a duty of candor, of course. Everyone has a duty. He couldn't lie to you about it. He shouldn't lie to us. That goes to my question. He shouldn't lie to us. That goes to my question. What is—Mr. Olson makes a good point of saying, well, he said that he was a consultant, but in truth, in fact, he was much more than what anybody would consider a consultant, and he was actually a filer. He was a litigator. He was a taker of a legal position. How do you square your candor of I was a consultant for the state of Louisiana with what Mr. Olson characterizes as a completely different role? Your Honor, the word consultant, as Judge Costa said, is a broad one. If we look in Webster's, we find that it means to give advice, and obviously this is a big piece of litigation. Obviously there's litigation all over the place. It stands to reason that if you hire a high-profile lawyer to be a consultant, that he could play a variety of roles, and we have hired on our side of the table many consultants in this case. We consider them to be— But you're considering that that would include either giving legal advice or taking a legal position or doing some sort of legal work because he's— and Mr. Olson says with respect to that, well, but he didn't say—he said he was a consultant. He didn't say he was a legal consultant. What he produced for the state of Louisiana would have been considered work product. His communications with the attorney general of Louisiana would have been attorney-client relations. There are all sorts of ways in which just the fact of being a, quote, consultant in a legal dispute brings you under the rubric of being an attorney. Now, it doesn't tell you exactly what he did, but that's not the test. The test is this is the most sophisticated legal team money can buy. They can go out and ask the questions. We have the fact that Mr. Moskowitz from a very fine Chicago law firm sat and interviewed Mr. Juneau for as long as he wanted. He could have asked anything. We don't even know whether this was gone into because we don't have contemporaneous accounts by Mr. Moskowitz. We have nothing in the record except somebody after the fact, Mr. Holstein, saying I didn't know about this. Quite bluntly, Your Honor, who cares what Mr. Holstein knows about this? The question is did BP know or were they sufficiently on notice that if this was important to them, they should have gone out and found out? We have a letter in the record that shows the attorney general of Louisiana communicating to BP and saying we want you to look at the things that Mr. Juneau submitted on our behalf to Mr. Feinberg. Doesn't that tell you that the attorney general considers Mr. Juneau to be his agent in these legal matters, at least to some extent? I think that that should be dispositive on this issue. Once you accept that he is not a judicial officer and there is no basis in the record for making him a judicial officer, the steps that are considered indispensable under Rule 53 were not followed, and there is just nothing there. And what's more, if I can just go to the third point before I turn to jurisdiction on what the findings were, we do have a special master in this case, Judge Freeh, who is tasked with looking into conflicts of interest, all sorts of things. BP never availed itself of the internal procedures that were available here. If they believed that there was dishonesty, they could have gone to special master Freeh and said we'd like you to investigate Mr. Juneau. In fact, in September of 2013, Mr. Freeh issued a report saying, I find Mr. Juneau's conduct to be at the highest exemplary levels, and the district court says, very well, continue your investigation of ethical issues in the CSSP, report to me every month, and that is ongoing. And there is no claim by Mr. Freeh anywhere in the record that there is any duplicity or improper behavior by Mr. Juneau. That's simply not, that's fabricated, and it's fabricated in this court, and it hasn't gone through any of the necessary filtration processes for the discovery, for the testing of evidence. What's going on here is just, we can dump things into the court of appeals record and ask you to make fact findings for the first time, but as the Supreme Court emphasized only two weeks ago in the Teva Pharmaceutical case, this court owes a great standard of deference. There has to be clearly erroneous, and not just to the specific I see a witness type findings, but to the contextual, what the court called the background facts, the knowledge of how the case has proceeded that the district court has and that this court cannot possibly have. If I may, I'd like to just turn very briefly to the jurisdictional question. Judge Benavidez is absolutely right that there is a case pending that we argued a few months ago on the jurisdictional issue. I think that there are, I'd like to make two points about footnote three of the BEL opinion, because every case that we've argued and challenged the jurisdiction, which this court has not fully engaged yet, this court meeting the Fifth Circuit, the answer has always been footnote three of BEL. First of all, footnote three acknowledges that it was not, that the jurisdictional issue was not well developed by the parties, and there is case law that says that when it's not fully resolved and the court hasn't really fully engaged it, that it will not have that kind of preclusive effect going forward. So I'm hearing it's not a very reliable opinion, Deepwater Horizon 1? Judge Southwick, I think it's an excellent opinion for quite obvious reasons. But I would note that, Judge Southwick, if one wanted to be very technical about it, in your opinion you joined only section one. Footnote three is not part of section one of the opinion, so even that part is ambiguous. But in your opinion and in Judge Clement's opinion, there is a great deal of focus on the peculiarity of the situation that the settlement structure is in place and paying out money before there has been a chance of review. Obviously, we're not in that position anymore. We've had the final disposition by this court. We've had certiorari denied. And so we're in a different circumstance. But I think also that if we went back to Deepwater Horizon 1, we'd find that this court didn't grapple with the decision of the Supreme Court, which has come between the last major opinion of this court on collateral estoppel, the Henry case, and the present time, and that's the Mohawk case. And in Henry, this court focused primarily on the question of whether it was unreviewable. In the Mohawk case, the Supreme Court said that's not the standard. Just because it's not reviewable doesn't mean that it's appealable at this point. And what was interesting in the Supreme Court's opinion in Mohawk is the court said, if it's really bad, if there's really a problem, you go through mandamus. That's what mandamus is for. And we think that the only possible basis for jurisdiction in this court is the mandamus standard. Now, that has implications. It has implications on the level of deference to the district court because under mandamus it has to be clear and indisputable, and there has to be essentially an arrogation or an usurpation of improper judicial powers. And the last thing that can be leveled at Judge Barbier here is that he is not adjudicating this case in a responsible fashion through the various complex stages below. So if we applied the mandamus standard, the court would have to find, first of all, that this merits mandamus review. And second, and intertwined with that, is the idea that it has to be so extraordinarily out of bounds, out of orbit, as some courts have said, of what a judge might do. And what we have here is just routine fact-finding. You say you didn't know, but you did know. I make that finding a fact. You say you lied to Mr. Freeh. You didn't lie to Mr. Freeh. I make that finding a fact. You say he's a judicial officer and that his 455 declarations are false. That's not true. He's not a judicial officer, and the parties put him before me, says Judge Barbier, in a fashion that implements a private settlement of which I have oversight. Thank you. Thank you very much. Good morning, Your Honors. Rick Stanley here for Patrick Juneau. In its brief, and again here today, BP has argued that it was not until 2014 that it knew the full extent of what Mr. Juneau was doing for the state of Louisiana, and not until 2014 that Mr. Feinberg allowed BP access to copy its emails. But neither one of those things is correct. In fact, there's something that has not been discussed in the briefs but is in the record. Three years earlier, in January of 2011, BP's attorneys filed in the district court over 20 emails that they had retrieved from Mr. Feinberg's files. Those emails were to various government officials in the Gulf states and included three emails sent directly to Mr. Juneau. Now that can be found in the record, in the district, well, the appellate record, at pages 1924 to 1979. Counsel, those emails are representative of others that are being talked about. Is that really what the law is? Sort of getting back to what your fellow counsel was saying on that side of the divide. Wherever it is, if it's in the haystack, they have to know about it. If it's somewhere buried in all that, an email that showed Juneau was doing more than perhaps they knew at the time, that's part of their due diligence. Is the standard that high? No, I think it's more than the needle in the haystack or looking up something in the New York Times. The record that I'm talking about is they actually filed a pleading in the district court, their attorneys did, attaching these emails as exhibits. Indeed, they also attached a letter from Mr. Feinberg to Attorney General Caldwell in Louisiana noting points of disagreement with what the Attorney General was recommending and specifically referencing the months of work that they had been doing with Patrick Juneau. So we're not talking about finding something that they're not aware of. These are BP's lawyers in 2011, which is a year before they interviewed Mr. Juneau, filing that in the district court. It would also be a year before they were focusing on Mr. Juneau. That's correct. It puts it back in the haystack, I would think. But I want to bring back another point, and that is the Moskowitz notes when they interviewed Mr. Juneau. There's a very important point we've kind of glossed over. Those notes, according to BP's brief, recorded what Mr. Juneau disclosed to Mr. Moskowitz, who is a BP attorney. The disclosure was that he had consulted with the state about, and I quote, the whole Feinberg process, close quote. And the word whole is important. He consulted about the whole Feinberg process, not part of it. There was no attempt by Mr. Juneau to diminish, limit, or understate what he had done. He said, I was consulting on the whole Feinberg process, and that is recorded by BP. Did anyone transcribe those notes? I've tried to read what was in the record excerpts, Moskowitz's notes. Is there a typed version somewhere? They're very hard to read, actually. And there is no typed version? The only typed version I used was from BP's brief on page 18. I saw that one. I figured that they probably have a better idea of what they say than we do, and that's what they interpret them to say, the whole Feinberg process. It seems to me the most troubling statement is the one made to Special Master Free. When looking at that statement, I mean, it gives you the impression Juneau had nothing at all to do with the oil spill or oil spill litigation. And I know you tried to give some context to that in your brief, but why don't you do that here? And I think there's two responses to that. I think in context what Mr. Juneau was trying to do was, anyone who knows Mr. Juneau knows he's a storyteller. He was trying to tell the story about how he was contacted, and when he was contacted for this interview, he really didn't have anything to do with the oil spill litigation anymore. His work for the State of Louisiana had ceased. He wasn't representing any claimants. He wasn't representing any defendants. And so he was kind of telling Judge Free the call came out of the blue, and Judge Free wasn't even asking him a question about his prior work for anyone. The thing that I think is most telling is that interview took place in 2013, which is a year after he was interviewed by BP and where he disclosed to BP and its counsel that I was involved in the whole Feinberg process. If Mr. Juneau had thought he was being asked about his prior work, there would have been absolutely no reason for him to not disclose it. He disclosed it to BP. Now I'd like to also briefly mention, Judge Southwick, you asked about the memorandum that we've heard a lot about, that Mr. Juneau has some billable hours where he reviewed and performed some work on this memorandum. And there were two things, the notice of joinder of a motion you referred to. The second thing is a memorandum, and that's included in the record at pages 2158 to 2163. And I would submit to the Court that that memorandum has been exaggerated beyond all measure. If you actually read that six-page memorandum that Mr. Juneau had spent a few hours working on as a consultant, it says that Louisiana does not want to impede in any way the GCCF, the Gulf Close Claims Facility. Rather, Louisiana was making suggestions in that memorandum to improve and expedite the payment of claims, and the memo ends with five recommendations, not with a demand for relief. There was never any secret that these were Louisiana's positions. In fact, some of the positions in that memorandum are the exact same positions that are reflected in that letter I started my argument with, which BP's lawyers submitted a month earlier when they filed that document in the district court. These are not adversarial. These were recommendations. Mr. Feinberg was free to accept them or reject them as he saw fit. How does that fit into your argument and to the fact-finding? Is it that even if it wasn't disclosed completely by referring to a consultant, it's close enough to not really being a representative, or it's far enough from really representing a party? Just where does that fit into your argument that that information isn't inconsistent? Well, I don't think it's inconsistent, Judge. I think that when you make a disclosure, you're disclosing essential facts, if you will, and if a party wants to inquire further, you can certainly do it. I've heard judges say, I know a particular lawyer, but they won't necessarily say, I've been to lunch with that lawyer three times and here are the restaurants. But if the judge makes a disclosure of that sort, it tells you a lot about why the disclosure is being made. Mr. Juneau, in this case, disclosed that he was a consultant. If anything, that's a broader and more amorphous term than anything, and I think as Mr. Issacharoff said, it can lead you to think that he had a broader role than simply a litigator. But in this case, I'll also tell the court, you're not really dealing with a judicial officer where parties don't get to choose. You get allotted to a district court. That's where you are. Here, the parties were able to choose the claims administrator, and so they're in essence interviewing someone for a job created by a private settlement agreement. This is not an instance where you've gone to court and been assigned to a section of the court. So I don't think the rules of 455 have any application. Well, you've all been assigned to us. We'll have to do the best we can. Thank you, sir. Thank you, Your Honor. The opposing counsel has referred to Judge Barbier's order. The salient portions of that order are that the claims administrator is not subject to the same recusal rules as a federal judge and so forth. It's a privately negotiated settlement agreement. Essentially, what Judge Barbier says is that there are no standards. It's completely up to him. In fact, those are the same positions advocated by Mr. Juneau and claims counsel, that there are no standards, you have no function here. That is not consistent with the cases under 455, the canons of judicial performance, which the compliance section requires to be applied to anybody serving in a judicial function as a judicial officer. It's the due process clause applies across the board with respect to provisions of the rules. This negotiated settlement agreement was an opt-in to the judicial process, not an opt-out of the judicial process. There have to be standards and there has to be impartiality, and the question is, could a reasonable person have reason to question the possibility that Mr. Juneau could be fair and impartial? But if you knew that the person about to be appointed was someone who had been your adversary, who had been an advocate, who had drafted pleadings against you in this very proceeding, you would have wanted to take that further. You would question the impartiality. That's the only test under 455A, and it's not just the test for judges. It's the people in the judicial process performing judicial functions. This process below is called the court-supervised settlement program. It's a part of Rule 23. Mr. Juneau is adjudicating facts and he's adjudicating policies, and the consequences that he has are hundreds of millions of billions of dollars of thousands and thousands of claims. That is the performance of a judicial function. So the only question is, what standards is he required to be impartial? And since he was a lawyer in the matter in controversy because he was giving advice without putting his name on it but giving advice to pleadings filed in this court in this proceeding, he's disqualified under 455B as it applies to him given the functions that he's performing. And if it's 455A, it's only waivable if there's a full disclosure on the record. The second finding that Judge Barbier made was that BP had actual knowledge of Juneau's, Mr. Juneau's, previous consulting work on behalf of Louisiana. But I just heard it said that that's an amorphous term. Yes, it is an amorphous term. That's what Mr. Juneau's lawyer just said to this court. And the implication is, well, they should have known. They had a sophisticated legal team. Well, the purpose of these standards aren't to apply one way if there's a sophisticated legal team and another way if there's a less than sophisticated legal team. The standards are to protect the judiciary and people that come into the legal process from the appearance of bias or prejudice or inequality in the application of judicial performance. And that is what BP didn't know, and it has no partial disclosure. It's not full disclosure. It's in the briefs, but one of the lawyers for Louisiana sent an email, and he said specifically, and BP did not know this, folks will be happy to see the work Pat Juneau is doing on behalf of the state to support the private plaintiffs. So what Mr. Juneau was doing, unbeknownst to BP, and when he took this very lucrative responsibility, with a lot of responsibility, administering all these claims in a very public way, he had a responsibility to say you need to know that I have drafted briefs on behalf of Louisiana for a very substantial fee that are adverse to BP in the matter that I'm about to undertake. But if he told them that he was a consultant for BP, I mean for the state of Louisiana, why couldn't BP say in your role as a consultant, what do you mean? What did you actually do? Did you file any papers? Did you take any positions? And, of course, BP knows what the position of the state of Louisiana has been, and so here, because there's a record being made of anything that comes in what Louisiana's position is, and he says generally I'm a consultant for the state of Louisiana on these things. I just can't understand if it's that important to say, well, what position did you take with reference to that? Did you file, did you help them with any pleadings? Or do you say, well, I'm just going to rely that with that you've told me everything I need to know? I think you could almost always say you should have inquired further. You know that this judge had relationships or this judge in the past has had private clients or this judge has had this, but it keeps coming to me, the phrase in Rule 10b-5 of the securities, it's not applicable here, but it's failure to disclose the facts necessary to make the statements made not misleading. What Mr. Juneau did was say I was a consultant. That's the best he could say. There's no dispute that he didn't say he was a litigator. He says he's still saying to this court he wasn't a litigator. He wasn't acting as a litigant, but he was, and there is really no dispute that the function he was serving was giving advice to a litigant against BP in this matter. He was also advocating policies to Mr. Feinberg with respect to payment of compensation, the disclosure requirements, and things that had to do where BP was taking an opposite position. Whatever the merits of those positions, BP was taking one position, and Mr. Juneau, unbeknownst to BP . . . At the time that this consulting disclosure was made, would BP have been aware of what Louisiana's positions were? In other words, if I say I'm consulting for the state of Louisiana, and Louisiana is of record with what their positions are, why would not one think that someone that's consulted with Louisiana may be in agreement with Louisiana's position and may have steered them in that direction? Well, is it a question of waiver? Because 455B is not waivable. 455A is only waivable if there's a full disclosure on the record, but if it's a question of timeliness as opposed to waivability, there must be . . . the test is actual knowledge of full disclosure of the grounds for arguable disqualification. And there was not full disclosure of the arguable grounds. This was an advocate. Would you in a lawsuit, Your Honor, or anyone in a lawsuit, want to know whether the person who was on the other side had been advocating positions against you? You would want to know that, and for that reason, in the interest of justice and respect for the judicial system, this claims administrator must be disqualified. Thank you, counsel. Thank you. Unless I've lost track, I think that's everybody on this case. Thanks to each of you for your very helpful explanation of your positions. We will take about a ten-minute recess.